UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ANDY FUENTES,

    Plaintiff,

       v.

LAJOIE BROS, INC. and GREGORY LAJOIE

    Defendants.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Andy Fuentes ("Fuentes" or "Plaintiff"), by and through undersigned counsel, and complains against the Defendants, Lajoie Bros, Inc. ("Lajoie Bros") and Gregory Lajoie ("Lajoie") as follows:

JURISDICTION AND PARTIES

1. This action arises under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*; Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. §§ 1981, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §831 *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; and the Maine Equal Pay law, 26 M.R.S. §§ 626-A and 628.

2. Fuentes is a United States citizen residing in Augusta, Maine.

3. Lajoie Bros, Inc. ("Lajoie") is a privately held, for-profit corporation located in Augusta, ME, specializing in construction services for local businesses, private homeowners, and large corporations.

1

4. Gregory Lajoie is a resident of Maine.

5. Gregory Lajoie is a shareholder and president of Lajoie Bros and also acted as one of Fuentes' managers during the time Fuentes was employed.

6. Lajoie Bros had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

7. This Court has subject matter jurisdiction over Fuentes' federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

8. On August 29, 2024, Fuentes filed a timely Complaint/Charge of Discrimination against Defendant alleging unlawful discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

9. On or about April 3, 2025, the MHRC issued a Notice of Right to Sue with respect to Fuentes' state law claims.

10. On or about April 7, 2025, the EEOC issued a Notice of Right to Sue with respect to Fuentes' federal law claims.

11. Fuentes has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

## JURY TRIAL REQUESTED

12. Fuentes requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

13. Andy Fuentes is a Hispanic male of Puerto Rican descent.

14. Fuentes has brown skin.

15. Fuentes was hired by Lajoie Bros. as a Concrete Laborer in 2020.

16. Due to Fuentes's beard, he is occasionally mistaken for a person of Middle Eastern descent.

17. During his time at Lajoie Bros, Fuentes was often subjected to derogatory comments and racist nicknames such as "Terrorist," "Muhammed," and "Ahmed".

18. When Fuentes expressed offense at these remarks, he was told, "You're a man; you shouldn't let these things bother you".

19. Fuentes was paid significantly less than white colleagues with comparable or less experience, despite being a consistently praised employee with an exemplary work ethic.

20. At least one white employee, who had less tenure and experience than Fuentes was being paid $30 an hour while Fuentes was paid a mere $21.50 for doing the same role.[1]

21. Defendants' practice of paying Fuentes less than his white coworkers constituted a violation of the MEPL and also constituted discrimination for purposes of the MHRA, Title VII, and Sec. 1981.

22. About two years ago, Fuentes' daughter was diagnosed with narcolepsy and cataplexy, conditions that substantially limit major life activities such as sleeping and significantly impair brain function when active.

23. Fuentes' daughter's condition is a disability for the purposes of the MHRA and ADA.

24. Fuentes has an association with a person with a disability for purposes of the MHRA and ADA.

25. Fuentes and his wife have no family support in Maine and are the sole caretakers of their children.

---

[1] This employee will henceforth be referred to as "AB" to protect his privacy.

26. Their daughter's conditions are unpredictable.

27. Upon his daughter's diagnosis, Fuentes disclosed information regarding his daughter's disabilities to Lajoie Bros and the potential that he would need accommodations in connection with caring for his daughter.

28. Fuentes disclosed this information in order to initiate an interactive process under the MHRA and ADA to ensure that he was afforded equal opportunities as his coworkers who were not associated with a disabled person.

29. In May 2023, Fuentes was diagnosed with ADHD, a condition that substantially limits activities such as concentrating and thinking, and significantly impairs brain function when untreated.

30. Fuentes's ADHD is a disability for the purposes of the MHRA and ADA.

31. Fuentes's condition is and was well-managed through medication and therapy.

32. Fuentes disclosed his diagnosis to Lajoie Bros and requested reasonable accommodations for his disability.

33. Fuentes also asked that if his employer did not grant his requested accommodations that they engage with him in an interactive process under the MHRA and ADA.

34. Fuentes made these requests to ensure that he was afforded reasonable accommodations which would provide him with equal opportunities as his non-disabled coworkers.

35. On March 23, 2024, Fuentes sent two emails to his supervisors, Steve LaChance and Gregory Lajoie, requesting accommodations for both his daughter's and his own medical conditions.

36. Fuentes also provided LaChance and Lajoie with paper copies of his requests.

37. Instead of engaging in a discussion about accommodations, Defendants presented him with FMLA paperwork and explicitly stated they were unwilling to discuss accommodations.

38. At the location where Fuentes worked, there was a whiteboard where employees were supposed to write out all of the days that they expected to be out, expected to be late, or expected to have to leave early.

39. Fuentes was concerned that due to his ADHD he may not remember to write out future need for schedule modifications on the white board and so sought accommodations with regard to the process for communicating his need for scheduling modifications.

40. After his emails were ignored, Fuentes spoke with Lajoie again and requested that at the very least he be given the ability to send an email at the beginning of each month outlining the dates and times of both his daughter's and his own medical appointments.

41. He requested this accommodation because his mental health disability affects his memory and organizational skills.

42. Fuentes requested this accommodation because he cared about his job and wanted the same opportunities as his non-disabled coworkers.

43. Fuentes's requested accommodation was reasonable.

44. Lajoie initially agreed verbally to this accommodation.

45. On March 29, 2024, Fuentes' wife emailed Lajoie with the dates and times of Fuentes' appointments for April.

46. Despite their previous agreement and agreed upon accommodation, on April 19, 2024, Fuentes was publicly berated by Lajoie and his manager, Dan Deschenes, for failing to use the whiteboard.

47. When Fuentes sought clarification from Lajoie, Lajoie dismissed his request, stating, "This is a very simple task that you should be able to do".

48. Fuentes found this comment offensive and believed it demonstrated discrimination based on his disability.

49. On April 24, 2024, Fuentes's wife emailed Lajoie seeking clarification regarding his accommodation request.

50. Lajoie did not provide a substantive response.

51. On May 6, 2024, Fuentes added his requested days off for May to the whiteboard.

52. In addition to writing his dates on the board, Fuentes texted Deschenes to confirm the dates as follows: May 2, May 10, May 17, May 20, and May 27, 2024.

53. He did this because he believed that his employer was unwilling to accommodate his reasonable requests for accommodation under the ADA.

54. On May 17, 2024, Fuentes received a text from a colleague asking if he was coming to work, despite having previously documented his need to be absent in advance.

55. Fuentes texted Deschenes to remind him that he had already requested May 17, 2024, as a day off.

56. Deschenes suggested that the entry on the whiteboard may have been "accidentally" erased.

57. Since Deschenes' text indicated that it was an administrative error, it was Fuentes' reasonable assumption that the situation had been rectified.

58. Out of an abundance of caution, Fuentes again sent Deschenes the picture of the days he'd requested off, clearly indicating that those dates were May 2, May 10, May 17, May 20, and May 27, 2024, respectively.

59. On May 20, 2024, Fuentes sent an email to Lajoie and Deschenes, detailing ongoing issues of being paid less than white coworkers with comparable or less seniority that Fuentes was asked to train to do the job, race discrimination, disability discrimination, and a hostile work environment.

60. Fuentes was respectful and professional in his email correspondence.

61. Fuentes made this complaint because he had a good-faith, reasonable belief that Lajoie Bros was violating the law with respect to these issues.

62. Fuentes reported his concerns about these issues because he wanted to address and eliminate these violations of law.

63. With regard to pay discrimination, Fuentes reported that three white coworkers were paid more than Fuentes despite the fact that Fuentes had more seniority than a couple of them.

64. In particular, at the time of his report of pay discrimination, Fuentes was earning $21.50 per hour. Upon information and belief, the white employees he referenced in his email were earning $30.00 per hour.

65. Fuentes and the white employees were employed in the same job.

66. Therefore, Fuentes was earning $8.50 less per hour than these white employees.

67. Defendant Lajoie Bros did not have an established seniority system or established merit system during the time that Fuentes was employed.

68. Fuentes's lower pay was not due to a shift differential.

69. Defendant Lajoie Bros violated the MEPL when it paid Fuentes less than white employees performing the same job.

70. No one responded to or addressed the email.

71. The following day, Lajoie called Fuentes into his office and terminated his employment immediately, citing a "no-call, no-show" on May 17, 2024.

72. It was Lajoie's decision to terminate Fuentes' employment and Lajoie terminated Fuentes.

73. When Fuentes provided evidence, again, that he had documented his absence on the whiteboard and that the absence had been related to his disabilities, Lajoie responded in a condescending and mocking tone, stating "I thought you weren't able to. I thought it was 'too much'", referencing Fuentes' previously denied request for accommodations.

74. Fuentes showed Lajoie the text confirming that he had requested the day off with Deschenes, but Lajoie dismissed him, stating, "Whatever it doesn't change anything… you were late six times in the last seven weeks."

75. Fuentes was not late six times in seven weeks.

76. Despite acknowledging that Fuentes had not committed a no-call, no-show, Lajoie refused to reverse his decision to terminate Fuentes' employment.

77. When Fuentes began to mention that he felt uncomfortable about how his termination had been handled, Lajoie responded mockingly, "You made it clear in your email what you thought. I got the whole email. You made it clear what you thought. I'm good."

78. Lajoie's reference to Fuentes' email is clear evidence of retaliatory intent and animus.

79. On May 30, 2024, Fuentes received a letter from Lajoie in response to a request for a written reason for termination.

80. The letter stated that Fuentes was terminated for a "no call/no show" on May 17, 2024, and May 20, 2024.

81. The letter further alleged, "you did not otherwise communicate with leadership concerning your need for leave".

82. This is demonstrably false.

83. Fuentes did not commit a no call/no show on May 17 or May 20, 2024.

84. Fuentes did communicate his need for leave to leadership in advance of those dates.

85. In the unemployment hearing that took place on July 25, 2024, Lajoie altered his rationale, claiming under oath that Fuentes was terminated for both a no-call, no-show on May 17, 2024, and for being 18 minutes late on May 20, 2024.

86. Lajoie falsely claimed he had reviewed security footage showing Fuentes arriving late on May 20, 2024, despite Fuentes not being at work that day due to a neurology appointment for his daughter.

87. Since then, Lajoie has provided six examples of alleged tardiness or absenteeism in over four years of employment.

88. This is contradicted by the unemployment hearing, where Lajoie stated, "Between the dates of 3/18/24 and 5/21/24… [Fuentes] was absent from work 14 days. I think 13 of those were excused. So 33 days that were worked of those 33 days, he was in late 13 times and left early two times. So he had basically out of 47 days, he worked 18, 18 full days."

89. These numbers are inaccurate and are different from both numbers that Lajoie gave to Fuentes in the conversation they had regarding his termination and numbers given in Defendant's pleadings to the Maine Human Rights Commission.

90. Upon information and belief, there were a number of white and non-disabled employees (including AB) who were late or absent more frequently than Fuentes, but were not disciplined or spoken to about their attendance.

91. In pleadings submitted to the Maine Human Rights Commission, Defendants have since alleged that Fuentes never once complained about the racist jokes made by his coworkers and superiors and that if he had, "that type of behavior would not be tolerated by Lajoie Bros".

92. This is again contradicted by Lajoie's testimony in the unemployment hearing, where he said to Fuentes: "The comments he made really had nothing to do with your race at all, right? I mean, they were comments that maybe have been not great comments, but they had nothing to do with your race at all. Is that correct?"

93. When Fuentes responded that this was "irrelevant" and the fact that he was "attacked racially [due to the] color of my skin and what I looked like", Lajoie mocked him, stating, "You have a beard because the color of your skin. I mean, am I wrong?"

94. Lajoie was referring to and acknowledging, under oath, the fact that Fuentes was harassed and subjected to comments including "Terrorist," "Muhammed," and "Ahmed" based on his appearance including the color of his skin and beard.

95. These comments were so unsettling that the hearing officer went out of their way to clarify that racial discrimination can be based on "the person's actual race or the person's perceived race as perceived by the person making the comment".

96. The fact that Lajoie knowingly provided false reasons for Fuentes' termination evidences pretext.

97. The fact that the stated reason for termination directly references instances of protected medical leave is evidence that Fuentes was terminated due to disability discrimination.

98. Fuentes has a disability under the ADA and MHRA.

99. Defendants regarded Fuentes as a person with a physical impairment and a disability and considered him a less valuable and less capable employee because of his impairment.

100. Defendants treated Fuentes differently and worse than his non-disabled coworkers.

101. Defendants failed to make reasonable accommodations to the known disability of Plaintiff, an otherwise qualified individual with a disability who was an employee, in violation of the MHRA and ADA.

102. A failure to accommodate claim does not require a showing of unlawful intent or animus, rather, if a Defendant denies a qualified employee with a disability a reasonable accommodation, then they are liable under state and federal law.

103. In any case, there is substantial evidence of unlawful motive in connection with Fuentes's disability, including probative timing, animus, and pretext.

104. Defendants terminated Plaintiff because he requested and required accommodations due to his disability in violation of the MHRA and ADA.

105. Defendants terminated Plaintiff because of his association with a person with a disability.

106. Defendants unlawfully terminated Plaintiff because of his disability and because of his request and need for accommodation in violation of the MHRA and ADA.

107. Defendants retaliated against Fuentes for reporting and opposing disability discrimination.

108. Plaintiff reported and opposed disability discrimination in the hopes that by reporting these violations of his rights that Defendants would investigate and take appropriate corrective action.

109. Plaintiff engaged in activity protected by the MWPA, MHRA, and ADA when he reported and opposed disability discrimination.

110. Defendants terminated Plaintiff because of his race and color.

111. Plaintiff was treated differently and worse than his white coworkers.

112. Defendants retaliated against Fuentes for reporting and opposing race and color discrimination including discrimination in pay and hostile work environment on the basis of race and color.

113. Plaintiff reported and opposed race discrimination and harassment in the hopes that by reporting these violations of his rights that Defendants would investigate and take appropriate corrective action.

114. Plaintiff engaged in activity protected by the MWPA, MHRA, Title VII and Section 1981 when he reported and opposed the hostile work environment, including racist comments, and when he reported and opposed discriminatory pay.

115. Plaintiff was treated differently and worse than his coworkers who did not engage in protected activity.

116. The causal connection between Plaintiff's protected activity and his termination is evidenced by direct evidence, probative timing, evidence of motive and animus, and evidence of pretext, namely the fact that Defendants have provided false reasons and allegations to justify and support its adverse employment actions to cover up the retaliatory and discriminatory purpose.

117. Plaintiff suffered substantial economic losses as a result of Defendants' discrimination and retaliation and continues to do so.

118. Defendants' discrimination and retaliation have caused Plaintiff substantial stress, anxiety, and humiliation and other non-economic damages.

119. Defendants knowingly violated Plaintiff's state and federal rights and/or violated Plaintiff's rights with reckless indifference and so are liable for punitive damages.

## COUNT I: ADA - DISABILITY DISCRIMINATION

120. Paragraphs 1-119 are incorporated by reference.

121. Defendant Lajoie Bros Inc.'s conduct violates the ADA's prohibition against disability discrimination against persons with disabilities and persons associated with other persons with disabilities.

122. Defendant Lajoie Bros Inc.'s conduct violates the ADA's requirement that employers provide reasonable accommodations to qualified employees with disabilities.

## COUNT II: ADA - RETALIATION

123. Paragraphs 1-122 are incorporated by reference.

124. Defendants Lajoie Bros Inc. engaged in unlawful retaliation against Plaintiff in violation of the ADA.

## COUNT III: MHRA - DISABILITY DISCRIMINATION

125. Paragraphs 1-124 are incorporated by reference.

126. Defendant Lajoie Bros Inc.'s conduct violates the MHRA's prohibition against disability discrimination against a person with a disability and against a person associated with a person with a disability.

127. Defendant Lajoie Bros Inc.'s conduct violates the MHRA's requirement that employers provide reasonable accommodations to qualified employees with disabilities.

## COUNT IV: MHRA - RACE DISCRIMINATION

128. Paragraphs 1-127 are incorporated by reference.

129. Defendant Lajoie Bros Inc.'s conduct violates the MHRA's prohibition against discrimination because of race and color.

## COUNT V: MHRA - RETALIATION

130. Paragraphs 1-129 are incorporated by reference.

131. Defendant Lajoie Bros Inc. engaged in unlawful retaliation against Plaintiff for making protected reports regarding disability discrimination, race and color discrimination, hostile work environment on the basis of race, and failure to accommodate in violation of the MHRA.

## COUNT VI, SECTION 1981- DISCRIMINATION

132. Paragraphs 1-131 are incorporated by reference.

133. Defendants discriminated against Plaintiff because of his race.

## COUNT VII, SECTION 1981-RETALIATION

134. Paragraphs 1-133 are incorporated by reference.

135. Defendants discriminated against Plaintiff because he engaged in activity protected by Section 1981 including reporting and opposing a hostile work environment on the basis of race and opposing disparate treatment on the basis of race including discrimination in pay.

## COUNT VIII: TITLE VII – DISCRIMINATION

136. Paragraphs 1-135 are incorporated by reference.

137. Defendant Lajoie Bros Inc. discriminated against Plaintiff because of his race and color, and his race and color were factors in the decision to terminate his employment.

## COUNT IX: TITLE VII – RETALIATION

138. Paragraphs 1-137 are incorporated by reference.

139. Defendant Lajoie Bros Inc. retaliated against Plaintiff because he engaged in activity protected by Title VII including reporting and opposing a hostile work environment on the basis of race and color and opposing disparate treatment on the basis of race and color including discrimination in pay.

## COUNT X: MWPA- RETALIATION

140. Paragraphs 1-139 are incorporated by reference.

141. Defendant Lajoie Bros Inc. retaliated against Plaintiff because he, in good faith, reported what he reasonably believed were violations of laws and rules adopted under the laws of Maine, a political subdivision of Maine, and/or the United States.

## COUNT XI: MAINE EQUAL PAY LAW

142. Paragraphs 1-141 are incorporated by reference.

143. Defendant Lajoie Bros Inc. paid Plaintiff lower wages than Defendant Lajoie Bros Inc. paid white employees for comparable work on jobs that had comparable requirements relating to skill, effort and responsibility.

144. Defendant Lajoie Bros Inc.'s conduct violated the Maine Equal Pay law.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendants to be in violation of his rights;

B. Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate his rights;

C. Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

E. Award equitable-relief for back pay, benefits and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award liquidated, treble damages in an amount to be determined at trial;

I. Award nominal damages;

J. Award attorneys' fees, including legal expenses, and costs;

K. Award prejudgment interest;

L. Permanently enjoin Defendants from engaging in any employment practices which discriminate on the basis of disability or retaliation;

M. Require Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate discrimination or retaliation in the future;

N. Require that Defendants post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

O. Require that Defendants train all management level employees on the protections afforded by the ADA, MHRA, Title VII, Section 1981, MWPA, and the MEPL;

  P. Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated him because of unlawful discrimination and retaliation; and

  Q. Grant to Plaintiff such other and further relief as may be just and proper.

Dated: April 11, 2025        <u>/s/ Chad T. Hansen</u>
                Chad T. Hansen
                Attorney for the Plaintiff

                EMPLOYEE RIGHTS GROUP
                92 Exchange Street 2nd floor
                Portland, Maine 04101
                Tel. (207) 874-0905
                Chad@EmployeeRightsLaw.Attorney